CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

AUG 29 2019

JULIA C. DUDLEY, CLERK
BY: s/ MARTHA L. HUPP
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| CYNTHIA N., on behalf of Z.N.S.,[1] | ) | |
| a minor child, | ) | Civil Action No. 4:18-cv-00038 |
| Plaintiff, | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| ANDREW M. SAUL, | ) | By:    Joel C. Hoppe |
| Commissioner of Social Security, | ) | United States Magistrate Judge |
| Defendant.[2] | ) | |

Plaintiff Cynthia N., on behalf of her granddaughter Z.N.S., asks this Court to review the

Commissioner of Social Security's final decision denying the child's claim for supplemental

security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1383f.

The case is before me under 28 U.S.C. § 636(b)(1)(B). ECF No. 11. Having considered the

administrative record, the parties' filings, and the applicable law, I cannot find that substantial

evidence supports the Commissioner's final decision. Accordingly, I recommend that the

decision be reversed and the case be remanded under the fourth sentence of 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see

also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is

limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials. The Court always refers to minors by their initials.

[2] Andrew M. Saul became Commissioner of Social Security in June 2019. Commissioner Saul is hereby substituted for the former Acting Commissioner, Nancy A. Berryhill, as the named defendant in this action. *See* 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

[its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005); *see Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## II. Legal Framework

A child is "disabled" within the meaning of the Act if he or she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). Social Security ALJs follow a three-step process to determine if a child claimant is disabled. The ALJ

asks in sequence whether the child: (1) is working; (2) has a severe medically determinable impairment; and, if so, (3) has an impairment or combination of impairments that meets, medically equals, or functionally equals any of the disabling childhood impairments listed in the Act's regulations. *Bryant v. Barnhart*, 63 F. App'x 90, 92–93 (4th Cir. 2003); 20 C.F.R. § 416.924(a).[3]

Step three has two parts. The ALJ must first consider whether the child's severe impairment(s) meets or medically equals the criteria for any specific listed impairment. 20 C.F.R. §§ 416.925, 416.926; *see Sullivan v. Zebley*, 493 U.S. 521, 529–34 (1990). If it does, the child "is conclusively presumed to be disabled and entitled to benefits." *Bowen v. City of N.Y.*, 476 U.S. 467, 471 (1986); *see* 20 C.F.R. § 416.924(d)(1). If it does not, the ALJ moves on to the "functional equivalence" part of step three. 20 C.F.R. § 416.926a. This holistic, fact-specific determination requires the ALJ to evaluate how appropriately, effectively, and independently the child performs in "six domains" of functioning when compared to other children the same age "who do not have impairments."[4] *Id.* To "functionally equal" the listings, the child's medical impairment(s) must cause "marked limitation" in two domains or an "extreme limitation" in one domain. *Id.* § 416.926a(d). "Marked" and "extreme" mean that the impairment(s) "interferes seriously" or "interferes very seriously," respectively, with the child's "ability to independently initiate, sustain, or complete activities" within a domain. *Id.* § 416.926a(e)(2)–(3). The claimant bears the burden of proving that he or she is disabled. *S.R. ex rel. R.R. v. Barnhart*, 371 F. Supp. 2d 796, 799 (W.D. Va. 2005).

---

[3] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

[4] The six domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for himself or herself; and (6) overall health and physical well-being. *Id.*

### III. Procedural History

In September 2014, Cynthia filed an SSI application alleging that five-year-old Z.N.S. was disabled by Attention Deficit Hyperactivity Disorder ("ADHD") and cerebral palsy. *See* Administrative Record ("R.") 21, 76, 161–64, ECF No. 9-1. Z.N.S. was a "preschooler" until she turned six in June 2015, but she was considered a "school-age child" for most of the relevant period. R. 21. Disability Determination Services ("DDS"), the state agency, denied her claim in February 2015, R. 76–86, and upon reconsideration that September, R. 87–100. In February 2017, Cynthia appeared with a non-attorney representative and testified at an administrative hearing before ALJ Mark O'Hara. R. 18, 44–75. Z.N.S., age seven, attended the hearing, but did not testify. *See* R. 44, 52.

ALJ O'Hara issued an unfavorable decision on May 5, 2017. R. 18–37. He found that Z.N.S. had the following "severe" medical impairments: ADHD, expressive speech disorder, autism spectrum disorder ("ASD"), disruptive mood dysregulation disorder ("DMDD"), oppositional defiant disorder ("ODD"), and "likely mild cerebral palsy." R. 21. Next, ALJ O'Hara considered whether those impairments met or medically equaled the corresponding childhood listings. *See* R. 21–23 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 111.07, 111.09, 112.04, 112.08, 112.10, 112.11). He cited specific, relevant educational records and opinion evidence to support his finding that Z.N.S.'s speech disorder did not meet the listing for disabling "communication impairment." R. 22; 20 C.F.R. pt. 404, subpt. P, app. 1 § 111.09. As for her other listed impairments, however, ALJ O'Hara simply concluded "there [was] no evidence of" the symptoms and functional limitations needed to establish disabling cerebral palsy, ADHD, or "personality or impulse control disorder," and no "medically document[ed] findings" of disabling ASD or DMDD. *See* R. 22–23.

4

ALJ O'Hara then summarized parts of the record, R. 23–27, and evaluated Z.N.S.'s impairment-related functional limitations in the six domains, R. 28–36. He found "less than marked limitation" in the first five functional domains, R. 29–35, and "no limitation" in overall health and physical well-being, R. 36. Thus, ALJ O'Hara concluded that Z.N.S. was not disabled between September 2014 and May 2017. R. 36. Cynthia asked the Appeals Council to review the decision and submitted two medical-source records showing that Z.N.S. walked with a left-sided limp on physical exam in August 2017, R. 9, and had "limited use of her left arm" and both hands secondary to cerebral palsy, R. 8 (undated letter). The Appeals Council explained that the "additional evidence [did] not relate to the period at issue" in ALJ O'Hara's decision, but that Cynthia could file a new application if she wanted the agency to consider whether Z.N.S. was "disabled after May 5, 2017."[5] R. 2. The Appeals Council declined to review ALJ O'Hara's decision, R. 1–5, and this appeal followed.

## IV. Discussion

Cynthia argues that the medical evidence, educational reports, and testimony in Z.N.S.'s record are "consistent" and "clearly support" a conclusion that the child was disabled because she had "marked limitations" acquiring and using information, attending and completing tasks, and interacting and relating with others, and an "extreme limitation" caring for herself at an age-appropriate level. *See* Pl.'s Br. 6–7. That question—whether Z.N.S. *was disabled* during the relevant time—is for the Commissioner to decide. The fundamental question before the Court

---

[5] In her brief, Cynthia notes that she filed a "new claim" sometime after May 3, 2018, and that Z.N.S. was awarded benefits on that claim in August 2018. Pl.'s Br. 2–3 (citing R. 2), ECF No. 12. Cynthia does not argue that the subsequent award relates back to ALJ O'Hara's conclusion that Z.N.S. was not disabled before May 5, 2017, and she has not described or submitted any of the medical "evidence relied upon in reaching the favorable decision," *Baker v. Comm'r of Soc. Sec.*, 520 F. App'x 228, 229 n.* (4th Cir. 2013) (per curiam). Accordingly, the award itself does not warrant remand under the sixth sentence of 42 U.S.C. § 405(g). *See* Def.'s Br. 2 n.1 (citing *Baker*, 520 F. App'x at 229 n.*), ECF No. 14.

today is whether the ALJ's conclusion that Z.N.S. was "*not disabled* is supported by substantial

evidence and was reached based upon a correct application of the relevant law." *Craig v. Chater*,

76 F.3d 585, 589 (4th Cir. 1996) (emphasis added).

A.    *The Relevant Law: "The 'Whole Child' Approach"*

ALJs use a special technique called the "'whole child' approach" to determine whether a

child's medical condition "functionally equals the listings." SSR 09-01p, 2009 WL 396031, at *1

(Feb. 17, 2009); *see* 20 C.F.R. § 416.926a. The ALJ "focus[es] first on the child's activities" and

"evaluate[s] how appropriately, effectively, and independently the child functions compared to

children of the same age who do not have impairments." SSR 09-02p, 2009 WL 396032, at *1

(Feb. 18, 2009). After the ALJ "determine[s] how the child functions in all settings" and

identifies which "activities are limited," he considers which "domains are involved in those

activities." SSR 09-01p *2. "Domains are broad areas of functioning intended to capture all of

what a child can or cannot do," *id.* at *1, both on a day-to-day basis and over time, *id.* at *9–10

& n.17. The ALJ must account for "the interactive and cumulative effects" of the child's medical

impairment(s) and related symptoms[6] on her activities "in any and all of the domains that [she]

uses to do those activities, based on the evidence in the case record." *Id.* at *2. Finally, the ALJ

"rate[s] the severity" of the child's overall impairment-related limitation in each affected domain

(e.g., moderate, marked, extreme) to determine whether the child is disabled. *Id.*

---

[6] "Symptoms" are the claimant's own description of her medical condition. 20 C.F.R. § 416.928(a). "If
the claimant is a child who does not describe, or cannot adequately describe, his [or her] symptoms
the ALJ will accept as a statement of [the child's] symptom(s) the description given by the person who is
most familiar with [the child], such as a parent, other relative, or guardian." *Gerette v. Colvin*, No.
7:15cv12, 2016 WL 1254611, at *8 (W.D. Va. Feb. 2, 2016) (internal quotation marks omitted), *adopted
by* 2016 WL 1296082 (W.D. Va. Mar. 30, 2016). The ALJ must follow the same two-step process to
evaluate the caregiver's testimony about the child's medical condition, just as he would if the child
claimant were testifying. *See id.*

"The critical element in [rating] the severity of a child's limitations is how appropriately, effectively, and independently the child performs age-appropriate activities," SSR 09-02p *3, compared to the expected "functioning of other children the same age who do not have impairments," *id.* at *11. *See* 20 C.F.R. § 416.926a(b). The ALJ should consider "the kind, extent, and frequency of help or adaptations the child needs," the settings where the child has trouble, and "all other factors [and evidence] that are relevant to" rating her limitations. SSR 09-01p *3. For most domains, the regulations include skills or activities "that illustrate the typical functioning of children in different age groups," as well as "examples of limitations within the domains." 20 C.F.R. § 416.926a(b)(1). Because "the examples do not necessarily describe a 'marked' or 'extreme' limitation," however, the ALJ must "consider all of the relevant information in [the] case record" when rating the individual child's impairment-related functional limitations. *Id.* § 416.926a(i)(3).

"There is no set formula" for determining functional equivalence. SSR 09-01p *9–10. The "child's day-to-day functioning may be considered 'seriously' or even 'very seriously' limited whether [her] impairments impact only one activity or limit several activities" within a domain. *R.S. ex rel. Herrera v. Berryhill*, 357 F. Supp. 3d 1033, 1037 (C.D. Cal. 2019) (quoting SSR 09-01p *9). Additionally, because "the effects of a child's impairments are considered" over time, the child can "have a 'marked' or 'extreme' limitation in a domain 'even though [she] does not have serious or very serious limitations every day.'" *Id.* (quoting SSR 09-01p *9). Determining whether the child has "marked" or "extreme" overall limitations "depends on the importance and frequency of the limited activities and the relative weight" of the available evidence. SSR 09-01p *9, *10 ("[T]he rating of limitation of a domain is not an 'average' of what activities the child can and cannot do."). The ALJ "must consider each piece of evidence in

the context of the remainder of the case record" to get "a full picture of the 'whole child'" and her activities and functional limitations. SSR 09-02p *12 n.24. The ALJ's decision itself should "provide sufficient detail" describing how he weighed relevant factors and evidence so subsequent reviewers "can understand" how he made his findings. SSR 09-01p *3.

B.      *The ALJ's Decision: Two Fundamental Errors*

        ALJ O'Hara's decision does not meet these minimum standards. First, too much of the determination was devoted to summary and not enough to logical, accurate analysis of the pertinent factors and all relevant evidence in the record. ALJ O'Hara concluded that Z.N.S. had at most "less than marked" limitations in each domain, R. 26, and "summarized evidence that he found credible, useful, and consistent," *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018). *See* R. 24–36. In several domains, the ALJ cited some evidence that supported finding slight or moderate limitations and other evidence that supported finding serious, or even very serious, limitations. *See* R. 29, 30, 32, 35. But he never explained how he concluded—*based on this evidence*—that Z.N.S.'s combined medical impairments had some "less than" serious impact, R. 21, 26, 29–36, on her abilities to "independently initiate, sustain, and complete" age-appropriate activities within these domains, SSR 09-02p *5. *See Woods*, 888 F.3d at 694. The ALJ's apparent reliance on mixed evidence about the "activities [Z.N.S.] can and cannot do," without logically explaining how he weighed that information considering the pertinent factors, also raises concern that he misapplied the Commissioner's "whole child" approach by "averaging" the child's strengths and weaknesses "to come up with a rating for the domain as a whole," SSR 09-01p, at *10. *See Bryant*, 63 F. App'x at 91, 94–96 (affirming where ALJ explained how he weighed child's "mixed record of normal functioning in some areas combined with meaningful limitations in others" when denying benefits).

8

Second, ALJ O'Hara cited evidence in some domains that either "ha[d] nothing to do with" the activities involved, *Mascio v. Colvin*, 780 F.3d 632, 639 (4th Cir. 2015), or arguably contradicted his finding that Z.N.S. had "less than marked" limitation in that domain, *see Ricky C. v. Social Sec. Admin.*, No. 4:17cv20, 2018 WL 3567288, at *7 (W.D. Va. June 22, 2018), *adopted by* 2018 WL 3551530 (W.D. Va. July 24, 2018). For example, the fact that Z.N.S. exhibited "spasticity at the ankles" on one neurological exam in May 2015, R. 30, sheds no light on how well she pays attention, stays on task, changes activities when asked, controls impulsive behaviors, or manages her time, R. 29. *Cf. Lewis*, 858 F.3d at 869 (ALJ did not explain how claimant's "normal gait bears any nexus to her complaint of chronic shoulder pain"). The ALJ must explain how he weighed that finding against other evidence he cited, such as Cynthia's reports that medication "helped" Z.N.S.'s "attention and impulse control" and a medical opinion that she had "marked limitation in attending and completing tasks," R. 30. On this record, "[t]here is no way for [me] to know whether, or why," the ALJ apparently gave the irrelevant physical exam "findings the same weight" as the other, relevant, evidence. *See Thomas v. Berryhill*, 916 F.3d 307, 312 (4th Cir. 2019).

Additionally, Cynthia's report that Z.N.S. "could *not* wash, bathe, or brush her teeth without help" seems at odds with a less than "serious" limitation caring for herself, R. 35 (emphasis added), compared to other school-age children, 20 C.F.R. § 416.926a(k)(2)(iv) (school-age children "should be independent in most day-to-day activities" even if they "may still need to be reminded sometimes to do these things routinely"),. Similarly, the facts that Z.N.S. was toilet trained and could feed herself, R. 35, also should "not negate the difficulties" she had with "other activities" or skills within this domain, SSR 09-01p *10, such as "demonstrat[ing] consistent control over [her] behavior" and "avoid[ing] behaviors that are

unsafe or otherwise not good" for her, 20 C.F.R. § 416.926a(k)(2)(iv). *See, e.g.*, R. 64 (four in-school suspensions for "[b]eing aggressive towards other students and not following [the] rules" or her teacher's instructions); R. 233 (did not look for cars before crossing the street); R. 511 (had "trouble staying [in] class most of the time," "poor frustration tolerance," and "meltdowns"). The ALJ's failure "to build an accurate and logical bridge from the evidence he recounted to his conclusion," *Woods*, 888 F.3d at 694, about Z.N.S.'s limitations in these domains constitutes reversible error. *See Elsie L. v. Berryhill*, No. 4:17cv50, 2018 WL 6981223, at *8 (W.D. Va. Dec. 4, 2018), *adopted by* 2019 WL 137617 (W.D. Va. Jan. 8, 2019).

C.    *The ALJ's Decision: Cynthia's Credibility*

Third, ALJ O'Hara did not explain how he weighed Cynthia's allegations that Z.N.S.'s severe autism, ADHD, and ODD (and their related symptoms) caused serious, or even very serious, ongoing problems attending to tasks, relating with others, and caring for herself.[7] The regulations set out a two-step process for ALJs to evaluate a claimant's symptoms. *Lewis*, 858 F.3d at 865–66; 20 C.F.R. § 416.929. "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Lewis*, 858 F.3d at 866. Second, assuming the claimant clears the first step, "the ALJ must evaluate the intensity,

---

[7] "Attending and Completing Tasks" considers the child's ability to "focus and maintain" attention; "begin, carry through, and finish" activities; the pace at which the child performs activities; and "the ease" with she changes tasks or routines. 20 C.F.R. § 416.926a(h).

"Interacting and Relating with Others" covers the child's ability to initiate and sustain "emotional connections" with familiar people, cooperate and comply with rules and social norms, respond to criticism, respect other people's belongings, and "respond to others appropriately and meaningfully." *Id.* § 416.926a(i).

"Caring for Yourself" captures how well the child maintains "a healthy emotional and physical state," including how she responds "to changes in [her] emotions and the daily demands of [her] environment to help" herself and others take care of her "personal needs, health, and safety." *Id.* § 416.926a(k)(1)(i). "To meet these needs successfully, [she] must employ effective coping strategies, appropriate to [her] age, to identify and regulate [her] feelings, thoughts, urges, and intentions." *Id.* § 416.926a(k)(1)(iii).

persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit [her] ability" to work, *id.*, or if the claimant is a child, to function at an age-appropriate level, 20 C.F.R. § 416.929(c). *See Gerette*, 2016 WL 1254611, at *8. "The second determination requires the ALJ to assess the credibility of [subjective] statements about symptoms and their functional effects," *Lewis*, 858 F.3d at 866, based on all the relevant evidence in the record. 20 C.F.R. §§ 416.924a, 416.926a, 416.929(c)(3). The ALJ must give specific, legally adequate reasons supported by "references to the evidence" for the weight assigned to the claimant's statements, *Edwards v. Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct. 21, 2013), and, when necessary, he should "explain how he decided which of [those] statements to believe and which to discredit," *Mascio*, 780 F.3d at 640.

ALJ O'Hara discussed some of Cynthia's statements in his summary of the record, R. 23–24 (testimony), and again as part of his functional-equivalence determination, R. 29–35 (citing Ex. 2E). He found Cynthia's testimony "regarding the severity of [Z.N.S.'s] symptoms and limitations [was] not consistent with the longitudinal record as a whole," but he did not give any specific reasons.[8] R. 24. He then "highlighted" portions of the medical record that he apparently believed undercut Cynthia's testimony that Z.N.S. was "disruptive" and "aggressive" towards other children," did not follow instructions or rules, and needed "help with social skills and controlling tantrums" and that "medication did not help her symptoms."[9] R. 23–24. His

---

[8] ALJ O'Hara "did not expressly consider the threshold question of whether" Z.N.S. produced "objective medical evidence of an impairment [reasonably] capable of causing" the actual symptoms, "in the amount and degree," that Cynthia alleged her granddaughter suffered. *Craig*, 76 F.3d at 591. Thus, he did not apply the correct two-part legal standard. *See Bradley v. Barnhart*, 463 F. Supp. 2d 577, 582–83 (S.D. W. Va. 2006). "The ALJ's error would be harmless [had] he properly analyzed credibility elsewhere," *Mascio*, 780 F.3d at 639, in his written decision. *See Crenshaw v. Astrue*, 3:09cv41, 2010 WL 23292136, at *4 (W.D. Va. Apr. 22, 2010), *adopted by* 2010 WL 2292138, at *4–5 (W.D. Va. June 7, 2010). "But here, the ALJ did not." *Mascio*, 780 F.3d at 639.

[9] Cynthia did not say that medications "did not help" the child's "symptoms" generally. R. 24. She testified that a medication prescribed for a sleep disorder did not help the child sleep, that her

summary centered on four psychiatric notes from Jitendra Annapareddy, M.D., all dated after

February 2016, reflecting Cynthia's comments that Z.N.S.'s mood, behavior, and attention were

improving with medication and that the child's mental-status exams were "unremarkable, except

for poor eye contact, pacing, and fidgeting." R. 24–25 (citing R. 513–22 (Exs. 29F to 32F)). He

also summarized records from one neurological exam in May 2015 where Cynthia told David

Taplinger, M.D., that Z.N.S. had "made consistent progress, with no developmental regression or

loss of skills," thanks to physical, occupational, and speech-language therapy. R. 25 (citing R.

451 (Ex. 12F). *See Lewis*, 858 F.3d at 869 ("An ALJ has the obligation to consider all relevant

medical evidence and cannot simply cherrypick facts that support a finding of nondisability

while ignoring evidence that points to a disability finding.").

ALJ O'Hara acknowledged that Cynthia "alleged significant limitations due to [Z.N.S.'s]

behavioral issues and problems with mood," but found that "such assertions [were] inconsistent

with records documenting reports by [her] caretakers," including Cynthia, noting "improvement

with respect to mood, behavior, and developmental skills." R. 26. He did not cite specific

records, but it seems likely that he was relying on the exam notes he had just summarized. Dr.

Annapareddy's notes reflect Z.N.S.'s reportedly "stable mood" and gradually improving

behavior, but they do not mention the child's "developmental skills." *See* R. 513–22. Dr.

Taplinger mentioned Z.N.S.'s progress in therapy and "no developmental regression or loss of

skills" to explain why deficits noted on her neurophysical exam were "mostly likely related to

mild cerebral palsy" versus "an ongoing degenerative process." R. 451, 453. He did not comment

on her severe autism, ADHD, or combined psychiatric disorders. *See* SSR 09-02p *12 n. 24

---

psychotropic medications had been "changed and increased a lot," and that the current regimen was "not
doing what [she] expect[ed] it to do." R. 60–61.

(noting "the importance of getting a full picture of the 'whole child'" and the agency's "longstanding policy that [ALJs] must consider each piece of evidence in the context of the remainder of the case record"). The ALJ did not explain which age-appropriate "skills" or activities he was referring to, why he believed they had "improved," or how they were a useful indicator of Z.N.S.'s functioning both on a day-to-day basis and over time. R. 26; *see* 20 C.F.R. §§ 416.924a, 416.926a. Thus, Z.N.S.'s purported "improvement" in unidentified "developmental skills" was not a legitimate reason to reject her grandmother's statements specifically describing how the child's complex mental impairments and related symptoms impacted her age-appropriate functioning. *Cf. Drake ex rel. S.F. v. Astrue*, Case No. 10-C-420, 2011 WL 4349370, at *7 (E.D. Wis. Sept. 15, 2011) (ALJ's vague, "overbroad characterizations" and findings "shed[] little insight into the complexities of the evidence" and did not address "all relevant evidence creating a logical bridge to the result domain").

ALJ O'Hara cited Dr. Annapareddy's notes again to support his conclusions that Z.N.S. had "less than marked" limitations attending to tasks, relating with others, and caring for herself. R. 30, 32, 34–35. But, he did not mention Cynthia's many other statements indicating Z.N.S. had "more than moderate," 20 C.F.R. § 416.926a(e)(2), limitations in at least two of those domains. *Compare* 20 C.F.R. § 416.926a(h)(2)(iv), (k)(2)(iv) (school-age children should focus and concentrate well enough to follow directions, remember and organize their school materials, complete household chores, and easily transition between tasks or activities "without extra reminders or accommodation," and "should be independent in most day-to-day activities" even if they "may still need to be reminded sometimes to do these things routinely"), *with* R. 232–34 (could focus for a "short period of time" on medication, needed "repeated" reminders to stay on task, "aggressive" towards other children, and could not finish what she started, complete chores

13

most of the time, put away toys when asked, wash and brush her hair, or choose clothes by herself), R. 363 ("defiant on a daily basis," needed "constant[]" supervision, had "numerous behavioral issues"), R. 425 (exhibited "atypical behavior" for age, including "fight[ing] with peers," social isolation, "outrageous tantrums," and "rigid adherence to specific non-functional routines and rituals"), R. 507 (sleep improving, but "increasingly irritable and snappy," had "a hard time controlling her emotions," and could not concentrate), *and* R. 511 (had "trouble staying [in] class most of the time," struggles "with following directions leading to poor frustration tolerance and lashing out"); *see also* R. 68 (considered switching to "school for children [with] autism spectrum disorder and behavior" problems); 20 C.F.R. § 416.924a(b)(5)(iv) (ALJ must consider evidence about structured or supportive settings). Even accepting that Z.N.S.'s "alleged significant limitations" related to behavior and mood were inconsistent with four progress notes reflecting "improvement" after February 2016, R. 24–26, ALJ O'Hara still had to explain how he considered Cynthia's other, consistent statements describing the child's symptoms and functional limitations. *See Briggs ex rel. Briggs v. Massanari*, 248 F.3d 1235, 1239 (10th Cir. 2001) (reversing where, "[w]ithout explanation, the ALJ passed over significant probative record evidence and deemed crucial testimony incredible").

Moreover, Cynthia was not the only adult who suggested Z.N.S. had serious, or even very serious, problems with specific age-appropriate skills or activities necessary to attend to tasks, relate with others, and care for herself. *See Elsie L.*, 2018 WL 6981223, at *6. Multiple educators and healthcare providers who personally observed Z.N.S. throughout the relevant time all expressed concerns about the child's limited capacities to pay attention, stay on task, regulate her emotions and impulsive behavior, interact with children and adults, adapt to changes in

routine, and follow rules or directions. In November 2013, for example, a teacher observed that

Z.N.S. "exhibited marked difficulty . . . following directions, responding to requests/redirects,

and understanding information presented verbally by the teacher and peers even with multiple

repetitions/rephrasing." R. 310. Z.N.S.'s Individualized Education Program ("IEP") included

accommodations for problems regulating behavior, controlling impulses and emotions, following

directions, and maintaining concentration, persistence, and pace. R. 67–69; *see, e.g.*, R. 269

(instructing teachers, on a daily basis, to "clearly define limits," "give advance warning when

transition is going to take place," "reinforce appropriate behavior"); R. 284–85 (setting long term

goals for staying "focused, remain[ing] on task and complet[ing] her classwork," following

"class rules with modifications," staying seated "for 5 minutes with no more than 1 verbal

reminder in two settings," and "not scream[ing] and cry[ing] when she is frustrated, upset, or not

wanting to do what [is] asked of her"). In the fall of 2014, her kindergarten teacher identified

"serious" to "very serious" problems, on a daily basis, following multi-step instructions,

changing from one activity to another without being disruptive, waiting to take turns, organizing

her school materials, staying on task without distracting herself or her classmates, and working at

a reasonable pace/finishing tasks on time. R. 203 (Attending and Completing Tasks). ALJ

O'Hara paraphrased the teacher's opinion as identifying "mostly a slight to serious problem" in

Attending and Completing Tasks, and he relied on his interpretation to support the conclusion

Z.N.S. had "less than marked" limitations in this domain, R. 30–31. ALJ O'Hara's discussion of

the IEP focused on Z.N.S.'s expressive speech disorder, R. 25–26, to show she had "less than

marked" limitations interacting and relating with other people, primarily because most people

could understand the child's speech, R.32. He did not mention any of the other IEP evidence. *See*

*Herrera*, 357 F. Supp. 3d at 1040 ("The [ALJ's] incomplete and/or incorrect characterization of

the record evidence calls into question the validity of both the ALJ's functional equivalence

determination, and the ALJ's decision as a whole.").

In August 2014, Richard Bindewald Jr., Ph.D., observed that Z.N.S. presented to an

evaluation as "disorganized in thinking and behavior." R. 406. Based on the "severity of

[Z.N.S.'s] behaviors," Dr. Bindewald referred her for a comprehensive mental-health assessment

to see if she qualified for Intensive In-home ("IIH") and Therapeutic Day Treatment ("TDT")

services. R. 363. The licensed professional counselor who evaluated Z.N.S. in early September

opined that Z.N.S. needed IIH services because her "escalating" behavior put her "at risk of

hospitalization or out-of-home placement." R. 371. Z.N.S. was "hyperactive during [the]

evaluation," jumping around, and "asking for candy continuously." R. 363. She would not

answer the counselor's questions. *Id.* On January 31, 2015, Franklin Russell, Ph.D., observed

Z.N.S. had trouble accepting direction, "recalling instructions," and finishing tasks on

standardized test; sometimes gave "'smart-aleck'" responses to questions or requests; could not

"sit in her seat without moving and squirming frequently," and exhibited an "inability to

concentrate and focus." R. 416–17. These findings show Z.N.S. exhibited "frequent

distractibility, difficulty sustaining attention, and difficulty organizing tasks," and could support

a finding that she had "marked" or "extreme" limitation in "understanding, remembering, or

applying information; interacting with others; concentrating, persisting, or maintaining pace; or

adapting or managing oneself." R. 22 (numerals omitted). Nonetheless, ALJ O'Hara found "no

evidence of at least one of the" listed criteria. *Id.*

In June 2015, Emily Bradshaw, Ph.D., observed during a two-day psychological

evaluation that Z.N.S. exhibited "high rates of demands and grabbing, with no verbal requests";

repeatedly "ignored" attempts to engage or talk to her; "refused" to follow directions, and often

changed instructions to her liking; "demonstrated oppositional responses" to requests; twice

"physically attached her body" to Dr. Bradshaw's body; "did not spontaneously share

information" and showed no "interest in finding out more about" Dr. Bradshaw's feelings or

interests; and was "only able to use gestures alone, with no verbal communication," when "asked

to 'show and tell' how to complete a sequential activity." R. 463–65. Dr. Bradshaw's

observations alone show that Z.N.S.'s record did, in fact, "have medically document[ed] findings

of qualitative deficits in verbal and nonverbal communication and in social interaction with

significantly restricted, repetitive patterns of behavior, interests, or activities." R. 23. ALJ

O'Hara did not mention them.

On July 6, 2015, Dr. Annapareddy noted that Z.N.S. "spoke in slow halting speech," was

"anxious and fidgety," had a "nervous" mood with "restricted" affect, became "irritable" when

asked to clean up toys, and exhibited "extremely limited" insight and judgment. R. 505–06. In

February 2016, Dr. Annapareddy wrote a letter stating that Z.N.S.'s "autism spectrum disorder

and ADHD" seemed to be causing "significant challenges" for her in public school, R. 478,

especially when dealing "with transitions and changes in schedule," R. 479. He recommended

that she move to a more structured setting to help "manag[e] her symptoms of autism and

improv[e] her educational functionality." R. 478. ALJ O'Hara did not mention any of the clinical

findings discussed in the preceding paragraphs. *See* R. 22–35. Yet, he relied on a handful of Dr.

Annapareddy's later notes showing "mostly unremarkable mental status examinations" to

support his conclusions that Z.N.S. had "less than marked" limitations attending/completing

tasks and interacting/relating with others. R. 30, 32–33. His failure to "address conflicting

evidence, or [to] explain away contrary findings" from Dr. Annapareddy and numerous "other

doctors in comprehensive manner" is reversible error. *Patterson v. Comm'r of Soc. Sec. Admin.*,

846 F.3d 656, 662 (4th Cir. 2017).

D.    *The ALJ's Decision: Medical Opinions*

Finally, ALJ O'Hara did not properly consider the available medical opinions in Z.N.S.'s

record. Medical opinions are statements from "acceptable medical sources," such as physicians

or psychologists, that reflect the source's judgments about the nature and severity of the

claimant's impairment, including her symptoms, diagnosis and prognosis, functional limitations,

and remaining abilities. 20 C.F.R. § 416.927(a). The ALJ must adequately explain the weight

afforded to each medical opinion in the record, taking into account relevant factors such as the

nature and extent of the source's treatment relationship with the claimant; how well the source

explained or supported the opinion; the opinion's consistency with the record as a whole; and

whether the opinion pertains to the source's area of specialty. *See Brown v. Comm'r Soc. Sec.*

*Admin.*, 873 F.3d 251, 268 (4th Cir. 2017); 20 C.F.R. § 416.927(c). Medical opinions from

treating and examining sources typically deserve more weight than those from reviewing

sources, such as DDS consultants. *Brown*, 873 F.3d at 268; 20 C.F.R. § 416.927(c).

Z.N.S.'s record contains medical opinions from two psychologists who separately

examined her in November 2014 and June 2015, and two DDS psychologists who reviewed her

records in February and September 2015.

Z.N.S. saw Dr. Bindewald in late November 2014 to determine whether she had ADHD,

"mood disorder, anxiety disorder, . . . or other type of behavioral/conduct disorder." R. 405; *see*

R. 363, 404–14. His three-part report primarily documents his interpretation of guardian and

teacher responses to various diagnostic assessments.[10] R. 405–12, 485–87, 490–95. According to

Dr. Bindewald, Cynthia's responses on one questionnaire showed "significant oppositional-

---

[10] The actual assessments are not in the administrative record.

defiant and conduct problems" and "very elevated" clinically significant deficits in "social

communication" and "social/emotional reciprocity." R. 409–10. Her responses on another

inventory indicated that Z.N.S.'s functional attention, emotional regulation, inhibitory control,

initiation, organization, planning, self-monitoring, and working memory were all "well below

average" (1st percentile) compared to her age peers. R. 410. Conversely, the kindergarten

teacher's responses revealed "no areas of deficiency in adaptive functioning" and suggested

Z.N.S. "exhibit[ed] above average functional skills for daily living without the assistance of

others." R. 491.  Dr. Bindewald opined that ADHD "and other executive dysfunction make it

difficult for [her] to get started, pay attention, finish her work, hold in mind a fact while

manipulating information," recall "facts stored in long-term memory," control her emotions and

behavior, and problem solve. R. 410–11.

Stephen Saxby, Ph.D., reviewed Z.N.S.'s records in early February 2015. R. 76–85. He

opined that Z.N.S.'s severe "ADHD with anxiety/mood component" caused "marked"

limitations in attending and completing tasks and "less than marked" limitations interacting and

relating with others and caring for herself. *See* R. 80–82. Dr. Saxby explained that Z.N.S. was

"primarily limited by behavioral and impulse control" problems and "some difficulty with

expressive language." R. 81–82. In September, Joseph Leizer, Ph.D., opined that Z.N.S. had

"less than marked" limitations in those domains. R. 94–96. He agreed Z.N.S. was "primarily

limited by behavioral and impulse control" problems and "some difficulty with expressive

language," but added that she also had trouble "in school with getting along with others, working

without distraction, and following rules appropriately." R. 95. He did not explain why those

additional problems supported a less severe rating in attending and completing tasks than Dr.

Saxby had identified. *Id.*

In June 2015, Dr. Bradshaw administered a nonverbal intelligence assessment as part of "a full evaluation to explore behaviors/symptoms" associated with autism. R. 458–67. Z.N.S.'s "cognitive ability [fell] in the below average range compared to her same age peers." R. 459. Dr. Bradshaw opined that "an intellectual disability [was] not suspected" based on those test results. R. 465. However, Dr. Bradshaw also opined that she "presented with many more problems" than her age peers on scales designed to measure "emotional[] reactiv[ity]," "attention problems," and "aggressive behavior." R. 465. Cynthia's responses to a parent questionnaire used to diagnose autism indicated that Z.N.S.'s adaptive functioning skills consistently ranked in the "below average" to "average" ranges, with "Communication" and "Self Care" presenting "as relative areas of weakness." R. 460–61. Dr. Bradshaw also opined that Z.N.S. had "severe deficiencies" in "reciprocal social behavior" and "restricted repetitive behavior." R. 462–63. Considering Dr. Bradshaw's evaluation, Dr. Annapareddy diagnosed Z.N.S. with "autism spectrum disorder secondary to medical condition without intellectual impairment requiring support." R. 475.

ALJ O'Hara gave "significant weight" to Dr. Bradshaw's opinion that Z.N.S. likely did not have an intellectual disability and to Dr. Bindewald's notation that Z.N.S. "exhibit[ed] above average functional skills for daily living without the assistance of others" and had "no areas of deficiency in adaptive functioning." R. 27 (citing R. 465, 491). He did not mention any other aspect of the examining psychologists' reports, *Lewis*, 858 F.3d at 869, including their clinical impressions that Z.N.S. had "severe deficiencies" and "significant" problems with specific age-appropriate skills or activities central to attending/completing tasks, interacting/relating with others, and/or caring for herself, R. 409–10, 462–65. *See Warren v. Astrue*, No. 2:08cv3, 2008 WL 3285756, at *11 (W.D. Va. Aug. 8, 2008) ("The ALJ's decision cannot be supported by substantial evidence when he fails to adequately explain his rationale for rejecting the opinions

of those whom he otherwise gave great weight to in arriving at his decision."). ALJ O'Hara gave

"great" weight to both DDS psychologists' assessments, "with the greatest weight" going to Dr.

Leizer's opinion that Z.N.S. had "less than marked" limitations in all domains. R. 27. He did not

explain why he rejected Dr. Saxby's opinion that Z.N.S. had "marked" limitations attending and

completing tasks in favor of Dr. Leizer's less severe rating in that domain—the ALJ simply

noted the conflict, R. 30–31, and chose the "opinion [that] lined up most closely with the view of

the record" he "espoused . . . in rendering his adverse credibility finding" against Cynthia.

*Brown*, 873 F.3d at 269. This is not allowed. *See Woodhouse ex rel. Taylor v. Astrue*, 696 F.

Supp. 2d 521, 533 (D. Md. 2010) (ALJ faced with conflicts in the evidence and differing medical

opinions must explain how he considered and resolved those conflicts). Accordingly, I find that

the ALJ's assessment of the medical opinions is not supported by substantial evidence.

V. Conclusion

I take no position on whether Z.N.S. is entitled to disability benefits for the relevant

period. On the current record, however, I cannot find that substantial evidence supports the

Commissioner's final decision. I respectfully recommend that the presiding District Judge

**DENY** the Commissioner's Motion for Summary Judgment, ECF No. 13, **REVERSE** the

Commissioner's final decision, **REMAND** the matter for further administrative proceedings

under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this case from the Court's active

docket.

**Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and
Recommendation], any party may serve and file written objections to such
proposed findings and recommendations as provided by rules of court. A judge of
the court shall make a de novo determination of those portions of the report or

specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: August 29, 2019

Joel C. Hoppe
United States Magistrate Judge

22